Allan A. **RYAN** and Lee **Leachman**, Comprising a Partnership Known as **Ankony Farm**, Plaintiffs,

v.

Coy **GLENN**, Defendant.

No. EC 70–83–K.

United States District Court, N. D. Mississippi, E. D.

June 16, 1972.

Robert D. Patterson, Aberdeen, Miss., for plaintiffs.

William S. Turner, Aberdeen, Miss., Mitchell, McNutt & Bush, Tupelo, Miss., for defendant.

## MEMORANDUM OPINION

KEADY, Chief Judge.

On March 16, 1972, this case was submitted to a jury which returned verdicts in favor of the defendant Glenn, both on plaintiffs Ryan and Leachman's suit for the balance of the purchase price ($33,144.84) for one-half interest in the bull, Ankonian Jupiter, and on Glenn's counterclaim for the recovery of all sums paid ($106,250) to Ryan and Leachman as counterdefendants. Ryan and Leachman at the close of evidence moved the court for directed verdicts on the issues raised in both the complaint and counterclaim, which motions were overruled; and upon the return of the jury verdicts, they moved in open court to have the verdicts set aside and for judgment notwithstanding the verdict on all issues. The court withheld entry of judgment to allow both sides to submit briefs in support of their contentions. The case is now ripe for decision.

The background facts of this controversy are revealed in our prior opinions dated March 25, 1971, 52 F.R.D. 185, and December 30, 1971, 336 F.Supp. 555, and need not be repeated here except for an understanding of the questions presently before the court.

We address ourselves first to the verdict in favor of the defendant for the balance of the bull's purchase price. Glenn in the fall of 1963 purchased a one-half interest in the animal for $125,000, and admittedly failed to pay the entire purchase price as agreed upon. The defense pleaded by Glenn was that at the time of the sales transaction, plaintiffs falsely represented Ankonian Jupiter to be a good breeding bull and an ideal match for Glenn's breeding program, which was based upon specific recommendations of plaintiffs, who were outstanding, expert breeders in the Aberdeen Angus industry; that Ankonian Jupiter was not fit for breeding purposes, a fact which plaintiffs either knew or should have known; and that plaintiffs' misrepresentations, upon which Glenn relied, caused damages to Glenn in excess of the purchase price balance sued for. At the time of the sales transaction, Jupiter was only 15 months old and had not actually been used for breeding purposes. It is enough to note that Glenn's evidence, which the jury accepted, established the following salient points: (1) that Leachman made to Glenn the stated representations regarding the bull's breeding capability; (2) that the bull was unfit for breeding and failed to produce outstanding calves; (3) that an expert breeder in the position of Leachman, who had known Ankonian Jupiter from calving and was familiar with his ancestry and blood lines, could tell with reasonable certainty whether the animal, at 15 months, was a good breeding bull, and thus Leachman either knew or should have known of the falsity of his assurances; and (4) that Glenn relied upon Leachman's representation and as a result suffered damage and injury greater than $33,144.84 sued for.

■■ It would serve no useful purpose to detail the testimony of several expert witnesses who testified for Glenn to the effect that an expert cattle breeder would know whether Ankonian Jupiter was or would be a good breeding bull at the time he was sold by plaintiffs to Glenn. This evidence was, of course, controverted by plaintiffs' experts, who denied that anyone could know or tell about a herd sire until his calves were first proved out. Also Leachman vigorously denied making Glenn any statement regarding the bull's potentiality; it was Leachman's testimony that the only guaranty or assurance extended at

time of sale was against semen infertility and dwarfism. The evidence also tended to establish plaintiffs as highly expert in the Aberdeen Angus industry, and Glenn, who was a novice in the business, had implicit confidence in their recommendations. Such matters, of course, presented factual disputes for resolution by the jury. While mere expressions of opinion may not support a charge of fraud where the means of information are equally accessible, Deshatreaux v. Batson, 159 Miss. 236, 131 So. 346 (1930), and words of general commendation are not actionable, Thomas v. Mississippi Valley Gas Co., 237 Miss. 100, 113 So.2d 535 (1959), Glenn's evidence establishes more than mere general commendations or expressions of opinion of the ordinary character. Rather, the statements attributed to Leachman constitute matters of fact peculiarly within his knowledge as an expert breeder; and Glenn had the right to rely thereon, especially since the parties had unequal knowledge and mere inspection would not have disclosed any condition with respect to which the representation was made. 37 Am.Jur.2d, § 265, p. 356, ibid, states the applicable rule:

"The general principle that a representee has no right to rely upon matters opinionative in nature is held to apply only where the matter in question is as much within the knowledge of one party as the other, or where it is open to both parties equally for examination and inquiry. Thus, such statements may amount to fraud where there is a confidential relation between the parties, where the facts are not equally known to both of them, where fair investigation is prevented, or where the statement is deceptively designed to cause the representee to rely on it, in which case independent inquiry may be dispensed with because a factor has entered into the transaction which prevents its status as one at arm's length. Liability may also arise where the party expressing the opinion possesses special learning or knowledge on the subject, or where he has, is presumed to have, or assumes to have, knowledge upon a subject of which the other is ignorant, knowingly makes false statements on which the other relies, or has, or is presumed to have, means of information not equally open to the other, especially if the parties are not dealing at arm's length."

In accord, Restatement, Torts § 542(a). When Glenn's evidence is tested by the foregoing principle of law, which we believe the state courts of Mississippi would apply, it is sufficient to make the fraud issue one for the jury to resolve. It is our opinion that jury verdict in Glenn's favor is amply supported by credible evidence and the case was submitted to the jury under instructions which correctly stated the applicable principles of law.[1] Therefore, we find

[1] The court submitted special interrogatories to the jury, which were answered as follows:

INTERROGATORY NO. 1: Did Leachman assure Glenn that Ankonian Jupiter would be a good breeding bull and the ideal bull for defendant's breeding program? Answer: Yes.

INTERROGATORY NO. 2: If the answer to the foregoing interrogatory No. 1 is "yes", the jury must answer the following questions:

(a) Was such statement false? Answer: Yes.

(b) Was the statement material to Glenn's purchase of the bull? Answer: Yes.

(c) Did Leachman either know or should have known that the statement was false? Answer: Yes.

(d) Was Glenn unaware of the falsity of the statement, assuming it was false? Answer: Yes.

(e) Did Leachman intend that Glenn act upon the statement? Answer: Yes.

(f) Did Glenn rely upon the statement? Answer: Yes.

(g) Did Glenn have the right to rely upon the statement? Answer: Yes.

(h) Did Glenn suffer consequent and proximate injury as a result of the statement? Answer: Yes.

INTERROGATORY NO. 3: If the answers to Interrogatories No. 1 and 2

that the verdict for the defendant on the original complaint should be received by the court and judgment entered thereon accordingly.

The second inquiry relates to the propriety of the jury verdict in favor of the counterclaim whereby Glenn was awarded the recovery of all prior payments to Ryan and Leachman for Ankonian Jupiter. Ryan and Leachman assailed this finding vigorously on the contention that, conceding the issue of fraud, Glenn was under the duty to disaffirm the sales contract within a reasonable time after learning the facts constituting the fraud and that he is barred from rescinding, or seeking the rescission of, the contract because of failure to take timely action. Ryan and Leachman contend since the undisputed proof shows both unreasonable delay and continuing recognition of the contract, the court committed error in submitting to the jury the factual issue of whether Glenn disaffirmed the sales contract as soon as he had opportunity to learn the material facts about the bull through the exercise of diligence expected of a reasonable person under the circumstances.[2] If the jury's finding in favor of Glenn is based upon credible evidence, it is proper to enter judgment against Ryan and Leachman for $106,250. If plaintiffs are correct in their contention that Glenn delayed unreasonably long in exercising his right to rescind the contract and reasonable men would not differ in so concluding from the evidence, Ryan and Leachman would be entitled to judgment in their favor on the counterclaim notwithstanding the verdict of the jury.

 Recognizing that Mississippi law applies, both sides acknowledge that a contract obtained by fraudulent representations is not void but merely voidable; that the person defrauded has the election either to rescind the contract by making an appropriate tender and demanding a return of the purchase price or to affirm the contract and demand damages resulting from the fraud. A leading Mississippi decision on the necessity for prompt disaffirmance of a contract, as a prerequisite for preserving the right of rescission, is Whittington v. H. T. Cottam Co., 158 Miss. 847, 130 So. 745 (1930), a case relied upon by both sides. In *Whittington*, the Court clearly expressed the applicable rule:

"If a party defrauded desires to disaffirm a contract procured by fraud, he must do so with reasonable dispatch after discovery of the fraud. He must make his election, and this election must be made unreservedly. Knowing the facts, he cannot deal with the subject-matter of the contract and afterwards rescind it. The election is with him. He may affirm or disaffirm the contract, but he cannot do both. If he has full opportunity to learn all the facts and the law applicable thereto, and *fails, within a reasonable time, to rescind the contract, he is bound by it. He must exercise that degree of diligence which may be fairly expected from a reasonable person.*" (Emphasis added) 130 So. at 748.

Glenn argues that the key to the foregoing rule is that the defrauded person is not required to act at once, or within a given period of time, but may disaffirm the contract if he acts within a reasonable time, in the exercise of diligence expected from a reasonable person

(a–h) are in the affirmative, the jury shall answer the following questions "yes" or "no":
(a) Did Glenn suffer damages in an amount that equals or exceeds the unpaid balance of the purchase price sued for ($33,144.94)? Answer: Yes.
(b) Did Glenn suffer damages in an amount less than the aforesaid unpaid balance? Answer: No.

2. On this aspect of the case, the following special interrogatory was submitted to and answered by the jury:
INTERROGATORY NO. 4: Did Glenn disaffirm the sale's contract for the bull Ankonian Jupiter as soon as he had opportunity to learn the material facts through the exercise of diligence expected of a reasonable person under the circumstances? Answer: Yes.

in learning the facts regarding the fraud.

Mississippi, as well as the authorities generally, emphasizes that what is a reasonable time for disaffirmance depends upon the circumstances of each case. This was the precise holding in Bullard v. Citizens National Bank, 173 Miss. 450, 160 So. 280, at p. 283 (1935), as follows:

"When a purchaser has been defrauded in his purchase, he may elect to retain the property and sue for damages, in which case he has the entire period allowed by the statute of limitations in which to institute his action. But if he elect to rescind, and thereby to recover the entire amount paid for the property, the established rule justly requires reasonable promptitude on his part. Hundreds of cases and numerous texts have dealt with the letter question, but when all that is said in them is summarized, it leads to this: A purchaser who, under the actual facts, has the right to rescind must offer to do so within a reasonable time after discovery by him of those facts which justify the rescission, or within a like time after the discovery by him of facts reasonably sufficient to put him upon inquiry, which inquiry, if reasonably pursued, would have lead [sic] to a discovery by him of those facts. *And thus it is that each case must rest upon its own peculiar facts upon the stated issues of reasonableness,* Bonner v. Bynum, 72 Miss. 442, 446, 18 So. 82, and as to which in general the burden of proof is upon the defendant as in other instances of affirmative defenses." (Emphasis added).

The foregoing holding is in accord with the general law as stated in Annotation at 72 A.L.R. 726, 740, as follows:

"It is the general rule that the purchaser of a chattel who desires to rescind the contract of sale for fraud or breach of warranty must act promptly, and while the rule does not require immediate action on his part after discovery of the grounds warranting rescission, it does require him to act within a reasonable time, taking all of the circumstances into consideration." (p. 729).

"The reasonable time within which the purchaser . . . must rescind the contract does not begin to run from date of sale or delivery of the property, but only from the time that the purchaser has knowledge, or is chargeable with knowledge, of the fraud. . . ." (p. 740).

The cases also recognize that "a lapse of time which would be unreasonable in one case may be entirely reasonable in another; and an important consideration in determining the question of unreasonable delay is whether there has been a change of position by, or prejudice to, the party guilty of fraud or whether any third party has been prejudiced by the delay." 17A C.J.S. Contracts § 432, pp. 534–535.

Ordinarily, the question of what is a reasonable time for rescission in a given case is a matter as to which different conclusions may reasonably be drawn, and thus becomes a question of fact for the jury—whether the facts are disputed or different inferences may be reasonably drawn from undisputed facts. See Annotation 72 A.L.R. 753; United States v. Bradley-Dodson Co., 281 F.2d 676 (8 Cir. 1960); Zelinger v. Uvalde Rock Asphalt Co., 316 F.2d 47 (10 Cir. 1963). While there seems to be no Mississippi case factually in point, plaintiffs recognize that whether rescission was accomplished within a reasonable time is a question of fact for the jury unless only one inference may be reasonably drawn from undisputed facts, in which case the court may rule as a matter of law.

As stated by the Tenth Circuit in *Zelinger,* supra, construing Colorado law:

". . . [A] party to a contract should promptly exercise a right to terminate a contract. . . . This rule, however, is a rule of substantive law, not a rule of evidence. Whether

the right to terminate has been exercised promptly is a question of fact to be determined by the jury under a standard of reasonableness." at p. 53.

Ryan and Leachman argue that, although the exercise of the right of rescission is often a jury question, the court should hold as a matter of law on the basis of time and continuing use that Glenn waived any right he had. They cite several Mississippi cases holding that rescission was lost by the buyer's unreasonable delay in notifying the seller of the fraud, such as seven months delay in objecting to sale of oil, Tropical Paint & Oil Co. v. Mangum & Hatcher, 155 Miss. 876, 125 So. 248 (1929), one year's delay in sale of carbide light plant, J. B. Colt Co. v. Fuller, 144 Miss. 490, 110 So. 427 (1926), and one year's delay in sale of a closet, Rumsey & Sikemeier Co. v. Jacob, 92 Miss. 562, 46 So. 169 (1908). They also say that continued use of the bull after learning of his deficiencies and profiting therefrom bars rescission as a matter of law, citing Giles v. Phillips, 238 Miss. 528, 119 So. 2d 349 (1960), McDaniel v. Smith, 210 Miss. 71, 48 So.2d 638 (1950), and Ware v. Houghton, 41 Miss. 370 (1867). Without doubt these contentions have much force and must be considered with care.

Glenn's testimony was that he first told Leachman at the Chicago International Exhibition that Ankonian Jupiter was no good as a breeding bull, that he could take the bull back, and that he, Glenn, was not going to pay the balance of the purchase price. This conversation was fixed as having taken place in December of the year 1966 or 1967, Glenn being unable definitely to recall which year. Admittedly there was no prior disaffirmance by Glenn of the written sales contract executed on October 22, 1963, and the issue is whether a delay of at least three years in voicing objection and using Jupiter for breeding purposes in the intervening time so plainly amounts to a waiver of the right of rescission that a factual question thereon was not presented.

In weighing this issue, the court must view all of the facts, circumstances, and reasonable inferences most favorably to Glenn, since the jury made a positive finding that he acted to disaffirm the contract within a reasonable time after discovery of the fraud.

Ankonian Jupiter was calved in May 1962 on the premises of Ankony Farm at Rhinebeck, New York. He belonged to a herd which had achieved national distinction based upon the mating of Scottish bulls with American domestic heifers. In September 1963, when Jupiter was 15 months old, the owners, Ryan and Leachman, sold Glenn a one-half interest in him and retained the remaining ownership interest. Plaintiffs did not deliver immediate possession of the bull to Glenn; in December 1963 Jupiter, then 18 months of age, was shown by plaintiffs as a prize bull at the Chicago International Exhibition. In April 1964 Jupiter was first delivered to Glenn's farm near Columbus, Mississippi; he was then 2 years old and of breeding age. During 1964 Ankonian Jupiter was used as a herd sire and bred to females which Glenn had purchased from the Blue Sky Ranch. The first word that Glenn had concerning possible deficiencies in the bull was when Jupiter was 28 to 30 months old; this knowledge was gained at the close of 1964, when Glenn hired a new cattle manager by the name of Jack Weseli. Weseli advised Glenn that he had seen Jupiter at the 1963 International Exhibition, and was of the opinion that he would not be a good breeding bull because of his small stature, the smallness of his ancestry, and since he was reputed to be carrying the "Red factor". Prior to this, Glenn had no occasion to question the purchase.

Before buying Jupiter, Glenn had had no prior experience with purebred Aberdeen Angus bulls; however, at the time of the purchase he also acquired from plaintiffs an interest in a second prize bull, Ankonian Paragon, for whom a large price was paid. Glenn's intention was to use both animals as herd sires to

build an outstanding herd at his farm. After only brief service, Paragon in 1964 met an untimely death from burns.[3] This event necessitated Glenn's purchase from plaintiffs of another prize bull, Ankonian Enchanter, who likewise became an outstanding herd sire.

After Paragon's death, Glenn continued to use Jupiter as a herd sire throughout 1965 and 1966. Notwithstanding Weseli's adverse opinion, Glenn was still hopeful that the bull's calves would measure up to expectations and bring good prices in the market. In this connection Glenn testified that he wanted to give "the bull a chance to work out". The evidence indicated that Glenn stopped using Jupiter as a herd sire in 1966, or within two years after his first use by Glenn, although the breeding life of an Aberdeen Angus bull extends for a period of about 10 years. Of the approximate 160 calves sired by Jupiter, 4 were registered to Ankony Farm, 71 were registered to and sold by Glenn as breeding stock at an average price of $500, and the remainder, unfit for breeding, were steered and sold for commercial slaughter.

Jupiter's first calves at the Glenn farm were born in 1965 and the better offsprings, at the age of 13 to 15 months, were sold at two auctions held March 1 and September 30, 1966. These sales were preceded by Glenn's advertising Ankonian Jupiter (along with his fellow Ankonians, the deceased Paragon and Enchanter) as his herd sire in a national publication, Aberdeen Angus Journal (issues of March, July and October in 1965 and February and July in 1966), and in two catalogs distributed to potential customers. By October 1, 1966, Glenn thus knew the prices and market acceptance of not only Jupiter's first calves but the mature cows that sold bred to Jupiter or with his calf at side.

Jupiter's second registered calf crop (calved during 1966) was sold at Glenn's farm December 9, 1967; Jupiter was still advertised as a herd sire and featured along with Ankonian Enchanter and Ankonian Paragon II.

In annual cattle sales subsequent to 1967, Jupiter was advertised as a herd sire only incidentally, and few, if any, of his calves or cows bred to him were sold to owners of purebred cattle.

Glenn stated that it was only after the second sale that he realized that Jupiter's calves were inferior since they did not grow out at maturity (24 months). He affirmed that when he became certain of the misrepresentation he notified Leachman that he was not going to pay the balance of the bull's purchase price and Ankony Farm could have the bull back. Glenn testified that he offered to return the bull to plaintiffs in 1969–70 when they first employed Mississippi attorneys to collect the balance, but that plaintiffs refused this offer. When plaintiffs filed suit in 1970, Glenn counterclaimed to recover all sums previously paid but was unable to make tender of the bull since death had intervened.

The evidence discloses that Ankony Farm, although having the contractual right of possession in alternate years as one-half owner, never called for Jupiter and left him in Mississippi throughout the entire post-1964 period. Nor did plaintiffs request any portion of Jupiter's semen although so entitled under their agreement with Glenn. Instead plaintiffs used their proven herd sires at Rhinebeck, New York, until they decided upon a dispersal sale, which took place in October 1966. Even though plaintiffs had the right to call for Jupiter and place him in the ring to sell their one-half interest in him, Ryan and Leachman did not request delivery of the animal but merely listed him in their sales catalog. At the sale there were no buyers for plaintiffs' one-half interest in

---

3. The evidence shows that 'Ankonian Paragon was an excellent breeding bull, his calves proved to be outstanding, and one of his sons, Paragon II, in time became a herd sire at Glenn's farm.

Jupiter. Plaintiffs made no further effort to dispose of their ownership in the bull.

Glenn's testimony is not without contradictions. For example, on cross-examination he was asked when he first realized that he had been defrauded in the purchase of Ankonian Jupiter, to which he replied: "I would say in 1965 and 1966 when the bull did not mature out, and when the breeders kept reminding me of the red factor in his blood line." When he took the stand in rebuttal, however, Glenn testified that he first realized the fraud only when Jupiter's calves grew out to maturity, affirming that he could not be earlier certain of the fact of misrepresentation; he thus fixed the fall of 1967 as the time of discovery. Moreover, Glenn was uncertain whether his objection to Leachman which occurred at the Chicago International was made in December 1966 or 1967, and he conceded that it might have been in December 1967.

Of the payments made by Glenn for Jupiter, $75,000 was paid before the bull sired his first calf at Glenn's farm. Glenn paid an additional $12,500 in April 1965, or about the time of the first calving. Glenn made the next and last payment of $18,750 in October 1966, or immediately following the second September sale.

■ Taking all of the above considerations most strongly in favor of Glenn, we must conclude that reasonable men may differ on the question of whether he acted within a reasonable time and in the exercise of ordinary diligence after learning the defects of Ankonian Jupiter which would entitle him to disaffirmance. The jury might well consider that Glenn, who was completely untrained in the cattle business, was justified in his continued confidence in plaintiffs and the prestigious reputation of Ankony Farm as national leaders in the Aberdeen Angus cattle industry. His purchases of Paragon and Enchanter—both high-priced animals—were without objection. He was not required to act upon receiving the opinion of a new cattle manager, neither could he close his eyes to what was prudent. The jury might conclude that whether Weseli's opinion was valid could be proved only by how Jupiter's calves grew out and what they sold for in the market. Certainly Glenn cannot be faulted because he wanted confirmation of doubts that Weseli might have engendered in his mind. Likewise, making payments of substantial sums of money before Jupiter ever sired a calf at Glenn's farm is without significance. It would hardly be reasonable to say that Glenn should have disaffirmed the contract prior to the arrival and sale of Jupiter's first calves. We note that the first calves, born in 1965, were sold in 1966, which was well prior to the time Glenn registered his objections. From those first sales Glenn, of course, knew what price his calves would bring and their acceptability as potential breeding stock. While one might well conclude that Glenn should have acted promptly following the first year's calf sales, since reasonable minds might differ it was for the jury to decide whether Glenn unreasonably delayed disaffirmance of the contract, "to give the bull every chance to work out", and by waiting to see how his calves matured. Although substantial evidence indicates that an expert should know a bull's breeding potentiality much sooner, Glenn is not chargeable with the knowledge of an expert but only such facts as would place a person of ordinary prudence on notice that he had been defrauded by the seller and was entitled to rescind the sale.[4]

4. We note that an alternative contention of plaintiffs, in denial of the fraud issue, was that Leachman could not be guilty of a misstatement of "fact" since the breeding potentiality of a bull at a prebreeding age of 15 months, was beyond one's knowledge. To this end, plaintiffs offered expert testimony that cattle experts could not tell with absolute certainty about a bull's breeding capacity until his first calves matured.

Despite the difficulties presented by certain aspects of Glenn's evidence, the court feels that on the whole record it should not invade the province of the jury and hold as a matter of law that rescission was barred to Glenn, either because of mere lapse of time or the continued use of the animal.

The noted contradictions in Glenn's evidence as to when he first realized the facts constituting the fraud and when he disaffirmed the purchase to Leachman were also matters for the jury to resolve. Moreover, the unique circumstances of this case fail to show any element of prejudice or estoppel which would render rescission inequitable to plaintiffs. The death of Jupiter after plaintiffs refused to take him back relieved Glenn from any necessity of placing plaintiffs in statu quo ante. There is no indication that plaintiffs suffered any damage or change of position by reason of Glenn's delay in disaffirming inasmuch as plaintiffs at all times had access to the use of Jupiter as his part owner but failed to make any use of him. Indeed, plaintiffs established by October 1966 that their one-half interest in Jupiter was without market value. There is no evidence that third parties in any way suffered a detriment by the delay in Glenn's disaffirmance. Moreover, while Glenn advertised the Ankonian blood lines in his herd sires beyond 1966 and 1967, this was not an isolated reference to Jupiter but more prominently featured other Ankonian bulls, such as Paragon II and Enchanter. In summary we cannot say that allowing Glenn to rescind the purchase of Jupiter works an injustice upon the rights of plaintiffs, but hold that the jury, as the finder of the facts, was authorized to draw from the totality of the evidence a logical deduction that Glenn acted as a reasonably prudent man under the circumstances.

The above conclusion renders it unnecessary for the court to consider Glenn's alternative contention that the verdict on the counterclaim should be upheld because of the failure of Ryan and Leach-man either to plead waiver of rescission as an affirmative defense under Rule 8(c), F.R.Civ.P., or to raise the question of waiver as a viable issue in the pretrial order entered in the case.

Therefore, the court shall enter a judgment in accordance with the verdicts of the jury.