**Allan A. RYAN and Lee Leachman, Comprising a Partnership known as Ankony Farm, Plaintiffs-Appellants,**

v.

**Coy GLENN, Defendant-Appellee.**

No. 72–3048.

United States Court of Appeals, Fifth Circuit.

Feb. 8, 1974.

◆

C. Michael Malski, Amory, Miss., Robert D. Patterson, Aberdeen, Miss., for plaintiffs-appellants.

William S. Turner, Aberdeen, Miss., Fred M. Bush, Jr., Tupelo, Miss., for defendant-appellee.

Before TUTTLE, GODBOLD and MORGAN, Circuit Judges.

GODBOLD, Circuit Judge:

In October 1963 Glenn purchased from Ryan and Leachman, partners d/b/a Ankony Farms, a one-half interest in a 15 months old Aberdeen Angus bull, Ankonian Jupiter, for $125,000. Glenn made payments on the purchase price totalling $106,250, including interest. He refused to pay the balance of $33,144.84, and Ryan and Leachman sued him for this amount.[1] As a defense and as a counterclaim for the amount he had paid, Glenn alleged fraud in the inducement of the contract. At the conclusion of the trial the court denied motion by Ryan and Leachman for directed verdicts in their favor on their claim as plaintiffs against Glenn and on Glenn's claim against them.

By a general verdict and answers to written interrogatories, F.R.Civ.P. Rule 49(b), the jury found the issues in favor of defendant Glenn. The court denied with written opinion plaintiffs' motion for a judgment n. o. v., 344 F.Supp. 198 (N.D.Miss.1972), and entered judgment denying to plaintiffs recovery of the balance and granting to Glenn under his counterclaim the $106,250 he had paid. The plaintiffs appeal, and we affirm.

I. Fraud

The issue of the fraud which Glenn claimed to have been practiced upon him was described in the pretrial order, in the judge's charge to the jury, and in

Interrogatory No. 1, as whether Leachman represented to Glenn that Ankonian Jupiter would be a good breeding bull and would be the ideal bull for Glenn's breeding program. By its general verdict and its answer to Interrogatory No. 1 the jury answered this issue in the affirmative.

The position of Ryan and Leachman is that the fraud issue was improperly submitted to the jury, for two reasons. First, under Mississippi law, the statements alleged to have been made by Leachman that Ankonian Jupiter would be a good breeding bull and would be the ideal bull for Glenn's breeding program, were not actionable representations because they were mere words of commendation expressing the opinion of the speaker. Second, the statements were as a matter of law not false.

Statements of fact may be actionable misrepresentations. Statements of opinion, and mere "puffing," "trade talk" or "dealer's talk," may be actionable but under circumstances discussed below. Stribling Brothers Machinery Co. v. Girod Co., 239 Miss. 488, 124 So. 2d 289 (1960); Thomas v. Mississippi Valley Gas Co., 237 Miss. 100, 113 So.2d 535 (1959). An alleged misrepresentation may, however, contain elements of both fact and commendation or opinion. Where a statement sued on "involves an admixture of fact and opinion, wherein it cannot be determined what is of fact and what is of opinion, nor where fact has ended and opinion has begun," it is not actionable as fraud. Bullard v. Citizen's National Bank, 173 Miss. 450, 160 So. 280 (1935).

It is not necessary for us to decide whether the statements by Leachman were fact, an "admixture" of fact and opinion, or entirely opinion, nor whether they should be characterized as mere "puffing." Even if they were mere "trade talk," or wholly or partially opinion, the statements were nevertheless actionable if Leachman, the utterer, had

---

1. For earlier opinions in this case see 52 F.R.D. 185 (N.D.Miss.1971); 336 F.Supp. 555 (N.D.Miss.1971); 344 F.Supp. 198 (N.D. Miss.1972).

superior access to knowledge concerning the subject matter of the statements. Thomas v. Mississippi Valley Gas Co., *supra*; Deshatreux v. Batson, 159 Miss. 23, 131 So. 346 (1930).[2]

In *Stribling Machinery, supra,* the alleged misrepresentation was made by a salesman of heavy machinery to an operator of boats and barges.

> Girod [the buyer] testified that he asked Watkins, appellants' salesman, to recommend what it would take to repower one of his boats, so it could pull one or two barges up the river with a good load; and Watkins recommended this particular marine engine, stating it was what he needed. Girod said that, relying on this, he bought the marine engine which Watkins recommended.

124 So.2d at 293. The Mississippi Supreme Court held that the evidence did not support recovery, that the words were words of general commendation and nothing more than opinion, therefore they were not actionable. The court did not reach the question of unequal access to information. Superior knowledge by the seller had been alleged but presumably was not proved. In Thomas v. Mississippi Valley Gas Co., *supra,* the statements were that particular gas air conditioning units would perform as well or better than any electrically operated unit. The court held these representations not actionable because they were "puffing", mere general commendations of property sought to be sold. The evidence disclosed that the appellant and his architect made a trip to the plant of the manufacturer in another state and investigated the air conditioning units at first hand, receiving full information about them. The court referred to the nonactionability of merely commendatory sales talk and then said:

> Applying this principle to the factual business transaction in which the question most often arises, the rule is well settled that mere general commendations of property sought to be sold, commonly known as "trade talk," "dealer's talk," "seller's statement," or "puffing," do not amount to actionable misrepresentations where the parties deal at arm's length and have equal means of information and are equally qualified to judge of the value of the property sold. To such statements the maxim of "caveat emptor" applies.

113 So.2d at 538. Thus the court made clear that "trade talk" misstatements are unactionable only if the parties have dealt at arm's length and have equal access to information.

Bullard v. Citizens Nat. Bank, *supra,* arguably gives support to appellants' position that Leachman's statements were nonactionable as a matter of law. A bank officer allegedly represented to a widow with little business experience that bonds which it purchased for her were "gilt-edged and as good as gold" and that the ultimate payment on them was guaranteed by surety companies. The Mississippi Supreme Court held the latter statement to be a representation of fact and thus actionable. It held the former statement nonactionable. The court declined to analyze the cases from other jurisdictions stating that some cases considered such an assertion as the former to be fact and others considered it to be opinion, and rested its conclusion upon the observation that at most the statement was an admixture of fact and opinion and that it was impossible to determine where fact ended and opinion began. The court did not comment upon the allegations of superior knowledge by the bank's officer. If *Bullard* is considered to stand for the proposition that commendatory opinion is not actionable where there is allegation and proof of unequal access to information concerning the subject matter, we think that the Mississippi Supreme Court

2. A separate point is whether commendatory opinion becomes actionable when the parties are not equally qualified to judge the value of the property sold. In view of our conclusion concerning access to information we do not discuss this point at length. See quotation *infra* from Thomas v. Mississippi Valley Gas Co., 237 Miss. 100, 113 So.2d 535 (1959).

would not follow it. Our conclusion is buttressed by the full and careful statement of reasons filed by the experienced Mississippi District Judge in his order denying motion for judgment n. o. v. He stated the rule to be that "mere expressions of opinion may not support a charge of fraud where the means of information are equally accessible," and that, conversely, liability could arise where the utterer of an opinion possesses special learning or knowledge on the subject, and that the principle that one may not rely upon opinionative matter is applicable only where the matter in question is as much within the knowledge of one party as the other or open equally to both parties for examination and inquiry. And, finally, he stated his belief that the state courts of Mississippi would apply these principles. 344 F. Supp. at 201.

■ Whether Leachman possessed knowledge to which Glenn had no access was a controverted factual issue. We review the sufficiency of the evidence to carry to the jury the fraud issue under the federal standards of Boeing v. Shipmon, 411 F.2d 365 (C.A. 5 1969). There was evidence that an expert breeder in the position of Leachman, who had known Ankonian Jupiter from calving and was familiar with his ancestry, could tell with reasonable certainty whether the bull, at the age at which he was sold to Glenn, was a good breeding bull. There was contrary evidence from plaintiffs' expert that the only way to determine the bull's worth as a sire was to wait and see the quality of his calves, and if this were accepted the historical

knowledge possessed by Leachman concerning Ankonian Jupiter was unrelated to the bull's breeding qualities and thus was not superior knowledge.[3] The evidence was adequate under *Boeing*.

The court did not err in denying the motion for a directed verdict couched on the theory that Leachman's statements were as a matter of law not actionable.

■ Appellants' second argument also must be rejected. It is, in substance, that what Leachman uttered were mere statements of opinion about future events, and the element of futurity prevents what was said from being actionable. We are referred to no Mississippi cases in point. The general authority relied upon by appellants, Annot, 51 A. L.R. 46 at 145–146, provides that the general rule that misrepresentations must relate to a present fact and cannot ordinarily be predicated upon statements forecasting future events, is subject to the same exception of unequal access to knowledge. *Id*. at 81. And the reason for the exception is equally applicable.[4]

## II. Rescission

The court submitted to the jury the issue of rescission by Glenn, under the general verdict and by this Interrogatory:

Did Glenn disaffirm the sales contract for the bull Ankonian Jupiter as soon as he had the opportunity to learn the material facts through the exercise of diligence expected of a reasonable person under the circumstances?

The jury answered "Yes". Plaintiffs say rescission was not a jury issue.[5]

---

3. Similarly, it was also a factual question proper for jury determination whether Glenn, who was a novice in the cattle business but when he talked to Leachman was accompanied by his then farm manager, was as qualified as the prestigious Ankony Farms to judge the worth of Ankonian Jupiter as a breeding bull for the Glenn herd.

4. Obviously there is some element of futurity in many representation situations, so that the concept of nonactionability for forecasts of future events has to be applied with care. For example, in Thomas v. Mississippi Val-

ley Gas Co., *supra*, the representations related to air conditioning units to be later furnished and installed in a building to be constructed. The units would not be called upon to perform until a future time. (And indeed in many situations might not even exist when the representations were made.) The Mississippi Supreme Court did not even refer to futurity.

5. The use of the term "disaffirm" in the Interrogatory was not objected to. Throughout the charge that term and "rescind" were used as synonyms.

Again we examine the contention under *Boeing* standards. The action relied upon as rescission consists of a dinner-table conversation at a livestock exhibition in late 1966 or late 1967 in which Glenn stated to Leachman that Ankonian Jupiter never should have been sold to him (Glenn), that the bull should have been a steer (i. e. emasculated rather than used for breeding), and that he had no intention of making the final payment for Ankonian Jupiter. And, Glenn testified, on that occasion he offered to give the bull back.

■ We do not consider it a condition precedent to rescission that at the time Glenn offered the bull back he contemporaneously demand the return of the purchase money he had paid. The idea of rescission is restoration of the status quo. The refusal to pay more and a tender of the property purchased, plus at a later time and within the statute of limitations the filing of a suit (here the counterclaim) seeking return of purchase money paid, seems to us sufficient.[6] No Mississippi authority to the contrary is cited to us except a general statement from Ware v. Haughton, 41 Miss. 370 (1867): " * * * the idea of rescission involves the additional and distinguishing element of a restoration of the status quo, that is, an offer by the *moving party* to restore all that he has received under it, with a demand for the similar restoration to him of all that he has paid or given under it. * * *" But at a later point the same case says: "* * * And he (the purchaser) must put the other party in status quo, by an entire surrender of possession, and of everything he has obtained under the contract." (Emphasis added.)[7]

■ Also, appellants say that as a condition precedent to rescission Glenn was required to tender fruits of interim use of the property sold and that he failed to do so. There was evidence rising to *Boeing* standards that Glenn acquired no profits and benefits from interim use but rather suffered losses.

■ Rescission must be within a reasonable period of time after discovery of the facts on which it is based, Whittington v. H. T. Cottam Co., 158 Miss. 847, 130 So. 745 (1930), and reasonable dispatch is a case-by-case factual matter. In his statement of reasons the trial judge reviewed the evidence bearing on that inquiry. We restate it briefly. Glenn bought the one-half interest in Ankonian Jupiter in October 1963. The bull was not turned over to Glenn until April 1964 at which time he was two years old and of breeding age. In the interim Ryan and Leachman had showed him as a prize bull at the Chicago International Livestock Exhibition. During 1964 Glenn used Ankonian Jupiter for breeding purposes. The first word Glenn had of possible deficiencies in the bull was in late 1964 when he employed a new cattle manager, who stated to Glenn his opinion that the bull would not be a good breeding bull because he was too small in size, his ancestors were too small, and he was reputed to be possessed of an undesirable genetic factor.[8]

6. When suit was filed Ankonian Jupiter had died, so it was no longer possible for Glenn to put the plaintiffs back in possession of the property. But this was three years after the statement in Chicago which the jury could, and did, find was a sufficient tender of the bull, during which time the plaintiffs had not availed themselves of the tender offer.

7. Appellants contention comes up in the context of whether a directed verdict should have been granted to plaintiffs on the counterclaim. The point now asserted of no contemporaneous demand for the return of money was not made to the trial judge when the oral motion was made. The court charged the jury:

"As soon as he learns or has an opportunity to learn what the facts are, what the true facts are, he must act, certainly within a reasonable time, to notify the other party that he is rescinding the sale, he is disaffirming the contract, that he is tendering back what he got in the sale, the consideration he got—here it would be the bull—and that he will not recognize the contract to any further extent."

There was no objection to this instruction as insufficient.

8. Which might tend to cause some of his calves to be red rather than the more desirable black color.

Glenn continued to use Ankonian Jupiter as a herd sire during 1965 and 1966, and then discontinued using him.[9] He advertised him as a herd sire from 1965 to some time in 1968. Glenn testified that he wanted to give the bull "a chance to work out", that is, to see if his calves would measure up to expectations and would bring good prices in the market. The first calves were sold at auction March 1 and September 30, 1966, and the second crop was sold in December 1967. Glenn testified that he did not realize the calves were inferior until the second crop was sold. Glenn was himself untrained in the cattle business, but at least from 1964 on he had a knowledgeable cattle manager.

We agree with the analysis of the District Judge in his statement of reasons that Glenn was not as a matter of law required to rescind as soon as he heard the opinion of his new cattle manager, and that the jury was entitled to conclude that a reasonable person in Glenn's position could wait to determine whether the manager's opinion was valid by seeing the actual calves and observing how they sold in the market. Also bearing on this issue of the reasonableness of Glenn's waiting for the on-the-hoof facts was that he had purchased two other high priced bulls from Ryan and Leachman that had proved satisfactory and that Ankony Farms enjoyed an excellent reputation in the Aberdeen Angus cattle industry.

These same facts dispose of appellants' parallel argument that by retaining and using the bull after 1964 Glenn waived his right to rescind.

### III.

We have considered the claims concerning damages and the charge to the jury on damages. None has merit.

Affirmed.

9. There was evidence that the usual breeding life of a bull is about ten years. Ankony Farms retained the unsold half interest in the bull and was entitled to his possession and services in alternate years, but never exercised that right, nor did it ever secure semen from him for breeding purposes.