**Claude LEWIN, Plaintiff,**

v.

**James LONG, et al., Defendants.**

**No. Civ. 97–2741 (JAG).**

United States District Court,
D. New Jersey.

Nov. 22, 1999.

Gary S. Kull, Carroll, McNulty & Kull, L.L.C., Far Hills, NJ, for plaintiff.

Douglas J. Ehrenworth, Spector & Ehrenworth, P.C., Florham Park, NJ, for defendants James Long, Honest Entertainment Group, One Music Corporation, Telos Holdings, Inc., Robert Jenkins, and Bob Jenkins Music Services.

Peter Owen Hughes, Stanton, Hughes, Diana & Zucker, PC, Florham Park, NJ, for Jim Long Companies, Inc.

David Satnick, Loeb & Loeb, New York City, for OneMusic Corporation.

## OPINION

GREENAWAY, District Judge.

This matter comes before the Court on defendants' consolidated motion for summary judgment on Counts III, VII, VIII, XI, XII, XIII, and XV. The defendants moving for summary judgment are Jim Long, ("Long")[1] (incorrectly named in the Complaint as James Long) Honest Entertainment Group, ("HEG")[2] OneMusic Corporation, ("OneMusic")[3] Telos Holdings, Inc., ("THI")[4] Robert Jenkins, ("Jenkins") and Bob Jenkins Music Services ("BJMS").[5]

This case arises out of an alleged breach of contract. Plaintiff Claude Lewin ("Plaintiff") is a salesman in the music library industry, which involves the compilation and licensing of music and sound effects for use in radio, television, and other media productions. Plaintiff contends that defendants Long and Jenkins used plaintiff to "leverage" a deal that inured to their benefit and financially injured plaintiff.

Specifically, plaintiff claims that Long and Jenkins induced plaintiff to resign from his position as FirstCom's Eastern Division Manager, and to sign an employment contract with OneMusic. OneMusic's employment contract promised to employ plaintiff as the marketing and sales director of OneMusic's music library at a future date. By the terms of the contract, however, OneMusic retained the right to terminate plaintiff's employment on one-month's notice.

In addition, plaintiff claims that he negotiated an agreement (the "OneMusic/Gotham agreement") with OneMusic, whereby OneMusic promised to market and to sell at a future date a new start-up music library company called Gotham City Music ("Gotham") in which plaintiff was a partner. The parties, however, never executed the OneMusic/Gotham agreement. Even so, plaintiff contends that these two promises constituted a "package deal" that enticed plaintiff to resign from his position with FirstCom.

Once plaintiff resigned from FirstCom, he signed an employment contract with OneMusic. Before plaintiff began working for OneMusic, however, FirstCom and OneMusic executed an agreement (the "FirstCom/OneMusic deal") that obviated OneMusic's need for plaintiff's services. Specifically, the FirstCom/OneMusic deal provided that FirstCom would purchase OneMusic, and that OneMusic could use FirstCom's marketing and sales force to sell the OneMusic music library. As a result of the FirstCom/OneMusic deal, On-

---

1. Long is a successful entrepreneur in the music library business. In 1980, Long founded FirstCom Music Corporation, ("FirstCom") a company that is a wholly owned subsidiary of Zomba Enterprises, Inc. ("Zomba"). FirstCom produces, markets, and sells music libraries. After Long left FirstCom in 1995, he signed a non-compete agreement, which prevented him from entering the music library business until January 1, 1997. Soon after Long left FirstCom, he instituted a lawsuit against Zomba, seeking recovery of sums that Long believed that FirstCom owed to him. Zomba and Long settled that lawsuit on February 25, 1997. On November 13, 1998, plaintiff voluntarily dismissed his claims against defendants FirstCom, Zomba, and Jim Long Companies, Inc.

2. HEG is a division of OneMusic. HEG's principal place of business is located in Nashville, Tennessee.

3. In 1997, Long founded the music library company known as defendant OneMusic.

4. OneMusic was formerly known as THI. THI's principle place of business is located in Dallas, Texas.

5. FirstCom fired Jenkins in 1995. Thereafter, he founded his own music library company, known as Bob Jenkins Music Services ("BJMS"). BJMS was headquartered in Texas.

eMusic no longer needed to establish its own marketing and sales force. OneMusic, therefore, exercised its rights under its contract with plaintiff and terminated his employment. In addition, OneMusic ended its negotiations with plaintiff regarding Gotham.

In plaintiff's Amended Complaint, he claims that OneMusic broke the "package deal" promises. To support his position, plaintiff contends that OneMusic had a duty to disclose to plaintiff, prior to when they executed the OneMusic employment contract, the possibility that FirstCom might purchase part of OneMusic to the detriment of plaintiff and Gotham.

In plaintiff's Amended Complaint, he alleges Fraud, Breach of Contract, Intentional Interference with A Prospective Economic Advantage, and Estoppel. Plaintiff seeks compensatory and punitive damages from OneMusic, Long, and Jenkins regarding the Gotham transaction. In addition, plaintiff seeks back pay, front pay, and punitive damages regarding the OneMusic employment contract. The defendants seek summary judgment on all counts.

After reviewing the summary judgment proofs, this Court grants summary judgment on all Counts.

### FACTS

In the fall of 1991, plaintiff became a salesman for defendant FirstCom. On January 31, 1997, plaintiff resigned from FirstCom. While employed with First-Com, plaintiff established himself as an accomplished salesman, and developed a substantial and lucrative "book of business" that generated approximately $120,-000 in commissions to plaintiff during his last year at FirstCom.

In September 1996, while still employed with FirstCom, plaintiff and another First-Com employee, Emanuel Kallins ("Kallins") formed Gotham.[6] The two men hoped to make Gotham a viable competitor in the music library industry. Kallins agreed to produce the music, and plaintiff agreed to be responsible for the sales and marketing of Gotham's music library.[7] Because Gotham was in its early phase of development, plaintiff and Kallins concentrated on producing music and formulating Gotham's business and marketing plans.

Part of Gotham's business and marketing plan included acquiring financing and a viable distribution channel for Gotham's products. In late October 1996, plaintiff approached Jenkins to discuss whether BJMS would be interested in financing and distributing the Gotham music library. Eventually, while still employed with FirstCom, plaintiff mailed to Jenkins a joint venture proposal ("the BJMS/G proposal") addressing a possible BJMS—Gotham relationship.[8]

Specifically, the BJMS/G proposal expressly contemplated that BJMS would finance the selling and marketing of the Gotham music library to FirstCom's clients and customers. Throughout the proposal, plaintiff attempted to conceal his and Kallins' identities by "xxx"ing out all references to their names and to First-Com. In addition, plaintiff believed that if the wrong people saw his BJMS/G proposal, his position at FirstCom could be jeopardized. Plaintiff conceded also that if the BJMS/G proposal were successful, he intended to resign from FirstCom and to compete for his FirstCom customer base.

After reviewing the BJMS/G proposal, Jenkins rejected it. Jenkins explained

---

**6.** Kallins had offered to plaintiff the opportunity to acquire a 50% interest in musical compositions that Kallins jointly owned with another. These musical compositions became part of Gotham.

**7.** During plaintiff's involvement with Gotham, he did not attempt to sell Gotham's music

library to any customers. Plaintiff understood, however, that Gotham would compete directly with FirstCom, his then employer.

**8.** In the BJMS/G proposal, plaintiff included a CD demo containing music from Gotham's library.

that he and Long were forming a new music library called OneMusic, of which Jenkins would become the president in January 1997. Jenkins suggested that plaintiff, instead, offer to Long, a Gotham joint venture proposal with OneMusic. Shortly thereafter, plaintiff followed Jenkins' advice and proposed to OneMusic an agreement, which essentially contemplated that, through a written license and royalty contract, OneMusic would represent the Gotham music library for a term of ten (10) years. Plaintiff and OneMusic discussed also the opportunity for OneMusic to hire both plaintiff and Kallins as employees—hence the "package deal." [9] Jenkins responded that, due to the non-compete agreements that Jenkins and Long each had with FirstCom, neither he nor Long could discuss employment opportunities for plaintiff at OneMusic in connection with any arrangement with Gotham until after January 1, 1997.

Notwithstanding Jenkins' statement to the contrary, from October 1996 through January 1997, plaintiff discussed with Jenkins and Long, his potential employment with OneMusic. Furthermore, during that same period, plaintiff, Long, and Jenkins participated in numerous discussions and negotiations regarding the OneMusic/Gotham agreement. When OneMusic sent the final draft of the OneMusic/Gotham license and royalty agreement to plaintiff, plaintiff rejected it and requested further revisions. The undisputed facts show that the parties never executed the OneMusic/Gotham agreement.[10]

On January 28, 1997, Long faxed to plaintiff a draft copy of his OneMusic employment contract.[11] Plaintiff's OneMusic employment contract contained the express provision that either party could terminate plaintiff's employment upon one-month's notice.[12] After review, plaintiff made two handwritten changes, signed the contract, and sent it back to Long.[13] On January 31, 1997, plaintiff and Long signed the altered employment contract, which incorporated plaintiff's two changes therein. Plaintiff then submitted a resignation letter to FirstCom on January 30, 1997, which "serve[d] as a two week notice." [14] Plaintiff's resignation from his Regional Sales Manager position with

**9.** The evidence shows that plaintiff insisted that OneMusic hire Kallins as well as himself, or else plaintiff would not execute the OneMusic/Gotham agreement.

**10.** Even so, plaintiff proceeded to acquire a 50% interest in Kallin's compositions that would comprise the Gotham library.

**11.** Long claims that plaintiff wanted to resign from his position at FirstCom by the end of the month to devote more time to Gotham, irrespective of whether plaintiff had a signed contract with OneMusic. Plaintiff claims that he resigned from FirstCom due to strong encouragement from Long, and to become an employee of OneMusic. The undisputed facts show, however, that plaintiff initially pursued Long with a joint venture proposal, and that Long did not initiate the negotiations regarding the OneMusic/Gotham agreement. Moreover, Plaintiff refused execute the OneMusic/Gotham agreement unless OneMusic agreed also to hire Kallins.

**12.** When plaintiff saw the one-month termination provision in his OneMusic employment contract, he expressed concern that OneMusic might exercise its termination right immediately after plaintiff resigned from FirstCom. Plaintiff, therefore, asked that the provision be changed to guarantee to him six (6) months employment. OneMusic refused to agree to that change. Plaintiff signed the contract with the one-month termination clause therein, thus giving to OneMusic the right to terminate plaintiff at any time on one-month's notice.

**13.** Specifically, plaintiff's first change made clear that plaintiff was permitted to continue his involvement with Gotham. The second change stated that OneMusic would reimburse plaintiff for his COBRA coverage. OneMusic agreed to these two changes. COBRA stands for the Consolidated Omnibus Budget Reconciliation Act of 1985 and governs the extension of benefits to employees after their employment has been terminated.

**14.** Plaintiff claims that on January 29, 1997, Jenkins assisted plaintiff in drafting his resignation letter to FirstCom by faxing to plaintiff various handwritten revisions to his letter.

FirstCom became effective February 14, 1997.

At the time plaintiff resigned, the OneMusic/Gotham agreement had not been signed. Plaintiff, however, alleges that a verbal agreement had been reached with respect to key terms. Plaintiff claims further that he, Long, and Jenkins agreed that their verbal agreement would be memorialized in writing.

OneMusic contends that it forwarded to plaintiff a written draft of the OneMusic/Gotham proposal on January 31, 1997. The facts show that plaintiff refused to accept OneMusic's initial draft. Approximately two weeks after plaintiff received the draft from OneMusic, his attorney [15] sent to OneMusic, a four page letter requesting substantial revisions to the draft. Although negotiations between OneMusic and Gotham continued throughout February 1997, the parties never reached a meeting of the minds and never executed an agreement.

Nevertheless, on January 31, 1997, plaintiff entered into and signed an employment contract with OneMusic, which expressly provided that plaintiff's employment could be terminated by either party at any time, and for any reason, on one month's notice. The employment contract stated also that plaintiff's employment with OneMusic would begin on or before March 1, 1997; that plaintiff was to be paid $75,000 annually, or an average earned commission of 8%, whichever was greater; that plaintiff was to receive 1,000 shares of stock in OneMusic; that OneMusic would pay his COBRA medical coverage; and that OneMusic would contract with, market, and sell Gotham, (plaintiff's own music library), for a period of at least five years.

The employment contract enumerated plaintiff's duties. Specifically, as the Eastern Division Manager of OneMusic, plaintiff would market and sell both OneMusic's and Gothams's music libraries to businesses located on the east coast, including New Jersey.[16] Plaintiff claims that OneMusic's promises to hire him and to provide financial assistance to Gotham were a "package deal." [17] Unbeknownst to plaintiff, however, while he negotiated with OneMusic, OneMusic was simultaneously searching for outside financing, was negotiating for office space for its sales and marketing force in Dallas, Texas, and was discussing with other music library companies the possibility of representing their libraries. Long claims that ultimately, OneMusic wanted to compete with FirstCom.

Long explained that OneMusic's plan to compete with FirstCom changed "dramatically" on February 13, 1997, when he met with Clive Calder ("Calder"), the Chairman of Zomba, FirstCom's parent company. Another meeting with Calder took place on February 14, 1997. At these meetings, Long and Calder discussed a possible FirstCom/OneMusic distribution deal. After further negotiations, Long and Calder executed a FirstCom/OneMusic distribution deal on February 25, 1999.

Specifically, the FirstCom/OneMusic deal gave to FirstCom a 50% interest in, and the exclusive distribution rights to, OneMusic's music library in the United States and Canada.[18] In essence, the

---

**15.** Plaintiff's counsel during the OneMusic/FirstCom negotiations was Gary Kull, Esq. of Carroll, McNulty & Kull, L.L.C.

**16.** The employment contract stated also that plaintiff's office would be located in New Jersey; that OneMusic would cover expenses for office equipment, including a computer, printer, fax, and a telephone; and that OneMusic would pay to plaintiff $325.00 per month for rent.

**17.** The employment with OneMusic provided plaintiff with an opportunity to continue to sell in the music library business, and the Gotham deal allowed plaintiff to create and market his own music library.

**18.** OneMusic alleges that the FirstCom/OneMusic deal arose out of negotiations that Long had undertaken with Calder, that had commenced on February 13, 1997—after plaintiff had already resigned his position with FirstCom.

FirstCom/OneMusic deal eliminated One-Music's need to employ its own salespersons, including plaintiff. In fact, the First-Com/OneMusic deal expressly directed FirstCom employees, *and not OneMusic employees*, to sell the OneMusic library. As OneMusic no longer needed to establish its own sales and marketing force, OneMusic no longer required plaintiff's services.

On February 24, 1994, Long informed plaintiff that OneMusic and FirstCom had negotiated a distribution agreement; that OneMusic had been sold to FirstCom; that FirstCom had exercised its contractual right to terminate plaintiff's employment; and that plaintiff would receive a severance check representing one month's salary. Long then invited plaintiff to fly to OneMusic's office in Nashville, Tenn., to meet with Cecelia Garr ("Garr"), the President and Chief Executive Officer of First-Com, to hear an employment proposal that Garr had for plaintiff.

On February 25, 1997, Plaintiff flew to the Nashville meeting, wherein Garr offered to plaintiff a position with FirstCom to sell OneMusic's music library. Long suggested to plaintiff that he accept Garr's offer. Plaintiff dismissed Long's suggestion and rejected Garr's offer. Also, at that meeting, Long tendered to plaintiff a check from OneMusic representing one month's salary in the amount of $5,833.33, in accordance with the terms of the employment contract.[19] At that same meeting, Long advised plaintiff that OneMusic would not provide financial support and distribution assistance to Gotham, but suggested that Gotham pursue a similar agreement with FirstCom. Plaintiff dismissed Long's second suggestion.[20] Eventually, plaintiff sold his interest in the copyrights to Gotham's music library and accepted a position as a salesman for KillerTracks, a division of BMG Entertainment ("BMG"). At KillerTracks, plaintiff is currently responsible for selling BMG's music library. During the past two years, plaintiff's income at KillerTracks has been approximately $60,000 per year—half of the salary that he had earned during his last year with FirstCom.

On April 24, 1997, plaintiff initiated this action against defendants seeking redress for plaintiff's alleged injuries.[21] In his

---

**19.** The check included a notation that plaintiff's endorsement of the check would constitute a "release of any possible claims against OneMusic." Plaintiff never cashed the check.

**20.** Long similarly advised Kallins that he too was terminated from OneMusic; that Garr was prepared to rehire Kallins to work for FirstCom; and that Kallins should negotiate directly with FirstCom on behalf of Gotham. Kallins, unlike plaintiff, took Long's advice. The Gotham library is currently being distributed by FirstCom, and Kallins is now an employee of FirstCom.

**21.** Plaintiff originally filed suit in Hudson County Superior Court, Law Division, in New Jersey on April 24, 1997, setting forth ten (10) Counts against defendants. Defendants filed a notice of removal on May 27, 1997, to this Court, alleging that this Court has original diversity jurisdiction, pursuant to 28 U.S.C. § 1332. This case was thereafter removed to this Court, pursuant to 28 U.S.C. § 1441(a) and (b). On September 24, 1997, United States Magistrate Judge Haneke recommended that this Court deny OneMusic's motion to dismiss for lack of jurisdiction; that this Court grant in part and deny in part defendants Zomba's and FirstCom's motion to dismiss the complaint for failure to state a claim against defendants Zomba and/or First-Com, pursuant to Fed.R.Civ.P. 12(b)(6); that this Court grant in part and deny in part defendants Zomba and FirstCom's motion to require plaintiff to provide a more definite statement; and that this Court deny the motions to transfer venue to the Northern District of Texas. On March 24, 1998, this Court granted Zomba and FirstCom's motion to dismiss Counts I, II, IV, V, and VII–IX without prejudice and adopted Judge Haneke's recommendations regarding jurisdiction and venue. In addition, this Court adopted Judge Haneke's recommendations to deny defendants' request to dismiss Counts VI and X, and to deny defendants' request for a more definite statement with respect to Counts VI and X. On July 13, 1998, plaintiff filed an Amended Complaint alleging fifteen (15) Counts. On November 13, 1998, this court dismissed all claims and counterclaims against Zomba and FirstCom, including Counts IV, IX, X, and XIV. Lastly, by order dated December 22, 1998, Counts I, II, V, and VI were dismissed with prejudice. Accordingly, the defendants seek dismissal of the

Amended Compliant, plaintiff alleges fraud, breach of contract, intentional interference with a prospective economic advantage, and estoppel.

In sum, defendants argue that the undisputed evidence shows that defendants did not induce plaintiff to resign from FirstCom; that plaintiff initiated contact with defendant regarding the OneMusic/Gotham agreement; that until February 13, 1997, OneMusic had not considered the possibility that FirstCom might distribute OneMusic's library; that the FirstCom/OneMusic deal was not signed until February 25, 1997—*after* OneMusic hired plaintiff; and that once the FirstCom/OneMusic deal was signed, OneMusic promptly advised plaintiff of same and terminated plaintiff, in accordance with the terms of plaintiff's and OneMusic's executed employment contract. Defendants concede that they engaged in preliminary discussions with FirstCom regarding the possibility that FirstCom might distribute OneMusic's music library, while simultaneously negotiating with plaintiff. Defendants hasten to add that the possibility of a FirstCom buyout was remote prior to February 1997, considering Long's pending lawsuit against FirstCom.

In addition, defendants contend that the undisputed facts establish that prior to Long's February 13, 1997, meeting with Calder, OneMusic was actively preparing to compete with FirstCom. For example, defendants point out that OneMusic was seeking to obtain office space in Dallas for its marketing and sales force; that OneMusic had hired plaintiff and others in an effort to build that sales force; that OneMusic was actively pursuing outside financing to fund that effort; and that OneMusic was actively discussing representation arrangements with another independent music library to amass enough product to compete in the marketplace.

remaining Counts III, VII, VIII, XI, XII, XIII, and XV.

## DISCUSSION

### STANDARD FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) provides for summary judgment when the moving party demonstrates that there is no genuine issue of material fact, and the evidence establishes the moving party's entitlement to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Orson, Inc. v. Miramax Film Corp.,* 79 F.3d 1358, 1366 (3d Cir.1996). In making this determination, the court must draw all reasonable inferences in favor of the nonmovant. *See Hullett v. Towers, Perrin, Forster & Crosby, Inc.,* 38 F.3d 107, 111 (3d Cir.1994); *National State Bank v. Federal Reserve Bank of New York,* 979 F.2d 1579, 1581 (3d Cir. 1992).

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. *See Jersey Cent. Power & Light Co. v. Township of Lacey,* 772 F.2d 1103, 1109 (3d Cir.1985). The party opposing the motion for summary judgment cannot rest on mere allegations, but must present actual evidence that creates a genuine issue as to a material fact for trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Siegel Transfer, Inc. v. Carrier Express, Inc.,* 54 F.3d 1125, 1130–31 (3d Cir.1995). "[U]nsupported allegations in [a plaintiff's] memorandum and pleadings are insufficient to repel summary judgment." *Schoch v. First Fidelity Bancorporation,* 912 F.2d 654, 657 (3d Cir.1990); *see also* Fed.R.Civ.P. 56(e) (requiring non-moving party to "set forth specific facts showing that there is a genuine issue for trial"). In determining whether there are any issues of material fact, the Court must resolve all reasonable doubts as to the existence of a material fact against the moving party. *See Smith v. Pittsburgh Gage and Supply Co.,* 464

F.2d 870, 874 (3d Cir.1972). "In other words, the inquiry involves determining, whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Pitak v. Bell Atlantic Network Svcs., Inc.*, 928 F.Supp. 1354, 1366 (D.N.J.1996) (citations and internal quotations omitted).

### 1. *Choice of Law*

■ This matter is before the court based on diversity jurisdiction. The employment contract involved in this case, however, expressly provides for the application of Texas law. In addition, the parties do not dispute that the law of Texas governs the contract. In New Jersey, "[w]here a contract expresses a clear intent to have a particular jurisdiction's law govern, the parties' choice of law will apply unless it violates the public policy of New Jersey." *Haynoski v. Haynoski*, 264 N.J.Super. 408, 413, 624 A.2d 1030 (App. Div.1993) (citation omitted). Texas law is in accord. "Texas courts have long recognized that parties to a contract ... may specify in the instrument that it is to be governed by the law of a particular state and that law will apply...." *Whitley v. Hartford Accident and Indem. Co.*, 532 F.Supp. 190, 194 (N.D.Tex.1981) (citing *Dugan v. Lewis*, 79 Tex. 246, 14 S.W. 1024, 1026 (1891)). The parties have not argued that the application of New Jersey law to the instant dispute would contravene New Jersey public policy. This Court finds no basis to conclude that such would be the result. Based on this fact, the Court need not engage in a choice of law analysis. Accordingly, the Court will apply the law of Texas in its interpretation of the issues of law regarding this contract case. *See Briscoe v. Travelers Indem. Co.*, 899 F.Supp. 1304, 1308 (D.N.J.1995).[22]

### 2. *Fraud*

■ The Amended Complaint asserts a claim for fraudulent concealment. As is explained below, in Texas, fraud is deducible from both artifice and concealment. *See* 41 Tex.Jur.3d Fraud and Deceit §§ 14, 55 (West 1998).

■ Under firmly settled and oft confirmed Texas law, "the elements of fraud are" that: (1) "a material misrepresentation" was made; (2) "[it] was false," (3) "the speaker [knew it] to be false when made, or ... [made it] without knowledge of the truth;" (4) "[the misrepresentation] was intended to be acted upon;" (5) "[it] was relied upon;" and (6) "[it] caused injury" to the relying party. *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 688 (Tex.1990) (citing *Stone v. Lawyers Title Ins. Corp.*, 554 S.W.2d 183, 185 (Tex. 1977)); *accord Oppenheimer v. Prudential Sec. Inc.*, 94 F.3d 189, 194 (5th Cir.1996) (citing *DeSantis* ); *Trenholm v. Ratcliff,* 646 S.W.2d 927, 930 (Tex.1983) (citing *Wilson v. Jones*, 45 S.W.2d 572, 573 (Tex.Com. App.1932), holding app'd); *Oilwell Div., U.S. Steel Corp. v. Fryer*, 493 S.W.2d 487 (Tex.1973) (citing *Wilson* ). Furthermore,

> [f]raud is deducible from artifice and concealment as well as from affirmative conduct of a character such as tends to deceive. If there is a duty to speak, fraud may be found in the concealment of a material fact. If a person sustains toward another a position of trust and confidence, his failure to disclose facts that it is his duty to disclose is as much fraud as would be actual misrepresentation of true facts. That is to say, fraud may exist where there is a concealment of a material fact that should be divulged, as well as where there is a positive misrepresentation of a material fact.

*Anderson v. Anderson,* 620 S.W.2d 815, 819 (Tex.Civ.App.1981, no writ) (citing 25 Tex.Jur.2d Fraud and Deceit § 35). In addition, 10 Tex.Jur.3d Cancellation and Rescission § 16—Concealment of a Material Fact (West 1997), states that

> New Jersey has no overriding interest in applying its law here.

---

22. It is not necessary to apply New Jersey's governmental interest analysis here, because

[w]here the particular circumstances impose on a person a duty to speak and such person deliberately remains silent, the silence is equivalent to a false representation. That is to say, where a special relationship of confidence exists, the concealment of a fact that one is bound to disclose, being the equivalent of an indirect representation that the fact does not exist, differs from a direct false statement only in the manner in which it is made.

(footnotes omitted).

 In Texas, to successfully cancel a contract on the ground of fraudulent concealment, a plaintiff must prove an intentional suppression of a fact that the defendant is under a duty to disclose. *See Hansen v. Christie*, 132 S.W.2d 910 (Tex. Civ.App.1939); 41 Tex.Jur.3d Fraud & Deceit § 14 (West 1998). Thus, where proof is proffered that the defendant deliberately concealed from the plaintiff material facts that were integral to the plaintiff's understanding of the consequences of entering into the agreement, a contract may be canceled. *See Long v. Martin*, 234 S.W. 91 (Tex.Civ.App.1921, writ dism'd); 10 Tex.Jur.3d Cancellation and Rescission § 16 (West 1997).

 In addition, to determine whether a contract was procured by fraud, a court may properly consider the transaction as a whole, including the nature of the transaction, the extent of the consideration, the relationship and interests of the parties, the respective ages of the parties, the extent of defendant's efforts to perform, and all other relevant circumstances.

*Anderson*, 620 S.W.2d at 819 (citing 37 C.J.S. Fraud § 119 (1943)). "Mere silence, however, may not amount to fraudulent concealment where it is shown that the parties dealt at arms-length, no special relationship of confidence existed between them, the sources of information were equally available to both, and no inquiry

was made." 10 Tex.Jur.3d Fraud § 16 (footnotes omitted).

 A party asserting a plea of fraudulent concealment "has the burden to show not only that the defendant actually knew that a wrong had occurred, but also that the defendant purposefully concealed the wrong." *Nash v. Carolina Cas. Ins. Co.*, 741 S.W.2d 598, 602 (Tex.Civ.App.1987, writ denied); *see Dotson v. Alamo Funeral Home*, 577 S.W.2d 308, 311 (Tex.Civ. App.1979, no writ). In addition, allegations of fraud "must always be proved by clear and convincing evidence". *Saenz v. Kenedy*, 178 F.2d 417, 419 (5th Cir.1949) (quoting *Loew's, Inc. v. Bays*, 209 F.2d 610, 614 (5th Cir.1954)). Thus, to defeat a motion for summary judgment on a fraud claim, the non-moving party must make a showing sufficient to establish the existence of "a misrepresentation of a material fact." *James v. Nico Energy Corp.*, 838 F.2d 1365, 1372 (5th Cir.1988).

### a. Misrepresentation

 A misrepresentation may be material if it induced the complaining party to enter the contract. *See Marburger v. Seminole Pipeline Co.*, 957 S.W.2d 82, 86 n. 4 (Tex.App.1997, writ denied). "Statements of fact may be actionable misrepresentations." *Ryan v. Glenn*, 489 F.2d 110, 112 (5th Cir.1974). Statements of opinion, however, as to future or contingent events, to expectations or probabilities, or as to what will or will not be done in the future, are not actionable. *See id.* at 114. Misrepresentations must relate to a present fact, and "the element of futurity prevents what was said from being actionable." *Id.; see also Maness v. Reese*, 489 S.W.2d 660, 663 (Tex.App.1972, writ ref'd n.r.e.) (stating that future predictions and opinions do not serve as a basis for actionable fraud); *Griffin v. H.L. Peterson Co.*, 427 S.W.2d 140, 144 (Tex.Civ.App.1968, no writ) (concluding same in finding that predictions of the values of a silo in a dairy operation were mere opinions or prophecies as to future or contingent events, and not mis-

representations as to material existing facts).

Similarly, statements that can be categorized as "puffing" and "trade-talk" are not assurances of fact, and, thus, "do not amount to actionable misrepresentations where the parties deal at arms-length and have equal means of information." *Ryan,* 489 F.2d at 113. In addition, "[b]efore a promise to do something in the future can be actionable fraud, plaintiff must additionally plead and prove that at the very time the promise was made, [the defendant] did not intend to carry it out." *Brooks v. Parr,* 507 S.W.2d 818, 819–20 (Tex.Civ. App.1974, no writ) (citing *Urso v. City of Dallas,* 221 S.W.2d 869, 872 (Tex.Civ.App. 1949, writ ref'd)).

 In this case, plaintiff alleges that certain verbal and written statements, made by defendants, are "facts." Plaintiff then attempts to use these alleged assurances of fact to support his fraudulent concealment claim. The purported "assurances of fact," however, that plaintiff attributes to OneMusic, refer to predictions of future events by OneMusic—such as plaintiff "would receive 1,000 shares of OneMusic", and that plaintiff and OneMusic would "enter[ ] a partnership by way of the OneMusic/Gotham transaction". Pl.'s Br. at 8. These statements denote future orientation. Under *Brooks* and *Griffin,* defendant's predictions of the future, however, which were believed when made, cannot serve as a basis for a fraud claim just because they subsequently did not come to fruition. Furthermore, plaintiff has presented no evidence that defendants did not intend to carry out their future predictions at the very time that they were made. *See Brooks,* 507 S.W.2d at 820. Accordingly, this Court finds that defendants did not engage in any actionable misrepresentations.

### b. Duty to Disclose

Plaintiff argues that defendants had a duty to disclose the negotiations between OneMusic and FirstCom.

 Under established Texas law, no duty to disclose exists "if there is no confidential or fiduciary relation between the parties." *Southwest E & T Suppliers, Inc. v. American Enka Corp.,* 463 F.2d 1165, 1166 (5th Cir.1972); *accord Bay Colony, Ltd. v. Trendmaker, Inc.,* 121 F.3d 998, 1004 (5th Cir.1997) ("Texas law recognizes a duty to disclose only where a fiduciary or confidential relationship exists."); *see Borderlon v. Peck,* 661 S.W.2d 907, 908 (Tex. 1983) (stating that relationships of "trust and confidence" impose a duty to disclose); *Lang v. Lee,* 777 S.W.2d 158, 164 (Tex. App.1989, no writ) (stating that a "duty to make a full disclosure of the facts so that the fraud may be discovered" is required where a fiduciary or confidential relationship exists). A fiduciary duty may arise either by trust, statute, or contract. *See Chien v. Chen,* 759 S.W.2d 484, 495 n. 6 (Tex.App.1988, no writ). The word fiduciary applies to a situation where "trust" exists, and to situations "where 'the law demands an unusually high standard of ethical or moral conduct with reference to one another.'" *Id.* (quoting 1 Bogert, Trusts and Trustees, §§ 1, 3 (2d ed.1984)).

The doctrine of fraudulent concealment is generally limited to situations in which the defendant has a duty to disclose. Therefore, "the cases where fraudulent concealment applies are rare, such as those involving doctor-patient, attorney-client, or fiduciary relationships." *Patrick v. Howard,* 904 S.W.2d 941, 945 (Tex.App. 1995); *see e.g. Borderlon,* 661 S.W.2d at 908 (doctor-patient); *Willis v. Maverick,* 760 S.W.2d 642, 645 (Tex.1988) (attorney-client); *Seibert v. General Motors Corp.,* 853 S.W.2d 773, 776 (Tex.App.1993, no writ) (fiduciary). Whether a duty of disclosure exists is a question of law for the Court. *See Seibert,* 853 S.W.2d at 778.

This Court, therefore, must determine whether the alleged contract created a relationship mandating disclosure. Critically, "[i]n order to give full force to contracts, [the Texas courts] do not create

such a relationship lightly." *Schlumberger Tech. Corp. v. Swanson,* 959 S.W.2d 171, 177 (Tex.1997). Furthermore, "not every relationship involving a high degree of trust and confidence rises to the stature of a fiduciary relationship." *Id.* at 176–77. Regarding this determination, the Texas Supreme Court has spoken clearly in decreeing that "to impose [a fiduciary] relationship in a business transaction, *the relationship must exist prior to, and apart from, the agreement made the basis of the suit." Id.* at 177 *(emphasis added);* see *Transport Ins. Co. v. Faircloth,* 898 S.W.2d 269, 280 (Tex.1995) ("A fiduciary or confidential relationship may arise from circumstances of the particular case, but it must exist prior to, and apart from, the agreement made the basis of the suit"); *Consolidated Gas & Equip. Co. v. Thompson,* 405 S.W.2d 333, 336–37 (Tex.1966) (stating same).

Plaintiff argues that at the time that he was negotiating with OneMusic, OneMusic had already entered into an agreement in principle with FirstCom regarding an exclusive distribution arrangement of One-Music's music library. Plaintiff alleges that defendants had an affirmative duty to disclose the existence of the agreement in principle between OneMusic and FirstCom before plaintiff resigned from FirstCom, because a fiduciary relationship existed between plaintiff and defendants. Plaintiff further claims that defendants failed to disclose this information to induce plaintiff to join OneMusic and to resign from First-Com to plaintiff's detriment. Plaintiff's fraudulent concealment argument is defective for two reasons.

 First, an agreement in principle between OneMusic and FirstCom did not exist prior to plaintiff's resignation on January 31, 1997. The undisputed evidence shows that OneMusic had, at most, preliminary discussions with FirstCom in January 1997. The evidence shows further that it was not until February 1997, after plaintiff had already entered into the January 31, 1997, employment contract and re-

signed from FirstCom, that Calder and Long began serious negotiations to have Zomba/FirstCom exclusively distribute OneMusic's music library, to acquire a 50% interest in that music library, and to settle Long's lawsuit. Moreover, by February 21, 1997, as Calder attempted to renegotiate a term of the deal, an agreement in principle had still not been reached. The facts show also that it was not until February 22–23, 1997, that OneMusic and First-Com finalized their exclusive distribution agreement. Furthermore, the agreement was not executed until February 25, 1997. Finally, the facts show that prior to Long's February 13, 1997, meeting with Calder, OneMusic was actively preparing to compete with FirstCom, as OneMusic had entered into employment contracts with plaintiff and Kallin in an effort to build OneMusic's sales force.

 Second, assuming *arguendo* that there did exist an agreement in principle, prior to plaintiff's January 31, 1997, resignation, OneMusic did not have a duty to disclose, because plaintiff and OneMusic did not have a fiduciary relationship. Plaintiff contends that the defendant owed to him a fiduciary duty based on an employer/employee relationship. The undisputed facts show, however, that defendants were not plaintiff's employer at the time of the negotiations.

In the alternative, should this court find that no fiduciary duty exists, plaintiff suggests that the relationship of the parties may create a duty to disclose. Plaintiff asks that this Court follow the courts throughout the country that have fashioned flexible standards to determine when a duty to disclose exists in the absence of a fiduciary duty. Specifically, citing New Jersey cases, plaintiff asks that this Court focus on the course of dealings between plaintiff and the defendants, and whether the defendant had superior knowledge of a "suppressed" fact. Furthermore, plaintiff contends that because the parties expressly and impliedly reposed a trust and confi-

dence in each other, this Court should find that a fiduciary relationship exists.

■ A fiduciary relationship is an extraordinary one and will not be lightly created. *See American Med. Int'l, Inc. v. Giurintano*, 821 S.W.2d 331, 339 (Tex.App. 1991, no writ). "Informal fiduciary relationships, [however], also termed 'confidential relationships,' may arise where one person trusts in and relies upon another, whether the relation is a moral, social, domestic, or merely [a] personal one." *Hallmark v. Port/Cooper–T. Smith Stevedoring Co.*, 907 S.W.2d 586, 592 (Tex.App. 1995, no writ) (citing *Crim Truck & Tractor v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 594 (Tex.1992)). Texas recognizes the existence of confidential relationships in those cases in which influence has been attained and abused and in which confidence has been reposed and betrayed. *See id.* (citing *Crim Truck*, 823 S.W.2d at 595).

■ However, "mere subjective trust" between parties during negotiations "does not, as a matter of law, transform an arms-length dealing into a fiduciary relationship." *Id.* Moreover, while "[b]usinessmen generally ... trust one another and their dealings are frequently characterized by cordiality," *Thigpen v. Locke*, 363 S.W.2d 247, 253 (Tex.1962), the addition of "cordial friendship" to the formula does not heighten the trust, nor does it impose a fiduciary duty on either party. *Crim Truck*, 823 S.W.2d at 595. Even the eventual fruition of such negotiations "into a contract does not create a confidential relationship," sufficient, in and of itself, to form a "duty to disclose." *Bay Colony*, 121 F.3d at 1004. Moreover, "[i]t would be fanciful at best to suggest that every time one [negotiates] for a job with a potential employer that a fiduciary relationship is created." [23] *American Med. Int'l*, 821 S.W.2d at 340.

■ Here, the relationship between the parties was that of business acquain-

tances who were negotiating a deal at arms-length. No confidential or fiduciary relationship exists between parties dealing at arms-length with equal access to counsel. *See Fina Supply, Inc. v. Abilene Nat'l Bank*, 726 S.W.2d 537, 540 (Tex. 1987). The facts show that each party owned and operated fully independent music library businesses; that each party had their own attorney; and that each party made their own business decisions. Plaintiff negotiated a deal with OneMusic at arms-length and subsequently executed an employment contract.

In Texas, "[a] party to a written agreement is charged as a matter of law with knowledge of its provisions and as a matter of law cannot claim fraud when he is bound to the provisions unless he can demonstrate that he was tricked into its execution." *Lewis v. Penthouse Int'l, Ltd.*, 825 F.Supp. 131, 133 (S.D.Tex.1992) (citing *Texas Export Dev. Corp. v. Schleder*, 519 S.W.2d 134, 139 (Tex.App.1974, no writ)). Plaintiff has produced absolutely no evidence of trickery or deceit.

This Court finds that there are no genuine issues of fact which would preclude summary judgment. Plaintiff's claim that OneMusic had a duty to disclose to him that there had been preliminary discussions with FirstCom regarding the possibility that FirstCom might distribute OneMusic's library, based on a fiduciary or any other special relationship, is without merit. Here, the defendants did not engage in a material misrepresentation and had no duty to disclose. Accordingly, summary judgment is granted to the defendants as to plaintiff's fraudulent concealment claim.

### 3. *Breach of Contract*

■ Plaintiff claims that OneMusic breached both the OneMusic employment contract and the OneMusic/Gotham contract. Under Texas law, the main ele-

---

**23.** In Texas, "[n]ormally, an employer-employee relationship does not create a fiduciary

relationship...." *Gibson v. Matrix Resources, Inc. of Texas*, 1993 WL 42881 (Tex.App.1993).

ments in a suit for breach of contract are: (1) that a valid contract exists; (2) that the plaintiff performed or tendered performance; (3) that the defendant breached the contract; and (4) that the plaintiff was damaged as a result of the breach. *See Hussong v. Schwan's Sales Enterprises, Inc.*, 896 S.W.2d 320, 326 (Tex.App.1995, no writ); *Landrum v. Devenport*, 616 S.W.2d 359, 361 (Tex.App.1981, no writ).

### a. The Employment Contract

To determine whether summary judgment is appropriate based on a contract, the trial court must first decide whether the language of the contract is ambiguous. *See Hussong*, 896 S.W.2d 320 at 324. The language used by the parties should be assigned its plain, grammatical meaning, unless it definitely appears that the intention of the parties would thereby be defeated. *See id.* In addition, a contract is not ambiguous if it is worded so that it can be given a certain and definite meaning or interpretation. *See id.'* In Texas, the court will analyze the contract as a matter of law. *See Coker v. Coker*, 650 S.W.2d 391, 393 (Tex.1983); *GT & MC, Inc. v. Texas City Ref. Inc.*, 822 S.W.2d 252, 255–56 (Tex.App.1991, writ denied). When the contract, however, contains an ambiguity, a grant of summary judgment is improper because the interpretation of the instrument becomes an issue for the trier of fact. *See Coker*, 650 S.W.2d at 394; *Harris v. Rowe*, 593 S.W.2d 303, 306 (Tex.1979). This ambiguity would require a conclusion that a genuine issue as to a material fact exists. In this case, however, neither party claims that the contract contains an ambiguity.

*Hussong* presents a factual scenario that is instructive to the Court's analysis here. In that case, the plaintiff executed a written employment agreement with Schwan Sales Enterprises. *Hussong*, 896 S.W.2d at 322. The agreement had a voluntary termination clause enforceable by either party. *See id.* Specifically, the agreement stated that "[t]he Employee's em-

ployment under this [a]greement may be voluntarily terminated without cause by the Regional Manager of Employer, giving thirty (30) days prior written notice to the Employee or by the Employee giving not less than thirty (30) days prior written notice to the regional manager of Employer." *Id.* The contract stated also that "upon the employer voluntarily terminating Employee's employment, the Employee shall receive as severance pay the sum of $10,000." *Id.*

The plaintiff was dismissed without receiving thirty (30) days written notice, and was given the full amount of severance pay provided for in his contract. *See id.* The plaintiff sued Schwan alleging breach of the employment contract. Among other allegations, the plaintiff claimed that he did not receive thirty (30) days written notice. *See id.* The defendants moved for summary judgment. *See id.* at 322. In construing the contract, the court held that the voluntary termination provision in the Hussong–Schwan contract was not ambiguous. The court stated that "[the voluntary termination] provision clearly states that [the defendant's] regional manager could voluntarily terminate [the plaintiff's] employment without cause by giving 30 days prior written notice to [the plaintiff]." *Id.* at 324. In its analysis, the court determined that *"when an employment contract requires a certain period of notice, the employment may be canceled on shorter notice or upon none at all if the employee is paid wages or salary for the specified notice period."* *Id.* at 326 (emphasis added). The defendant's tender to plaintiff of the amount due to the plaintiff for the notice period led the court to conclude that a) the contract was not breached, and, b) summary judgment in favor of the defendant was appropriate. *See id.*

Here, plaintiff alleges breach of employment contract in Count VII of his Amended Complaint. Plaintiff's allegation of breach of employment contract is based on plaintiff's contention that OneMusic terminated his position without providing to

plaintiff one-month's written notice, and without providing to plaintiff 1000 shares of OneMusic stock. The January 31, 1997, employment contract, however, expressly gave to OneMusic (as well as to plaintiff) the unqualified right to terminate plaintiff's employment "on one (1) month written notice."[24]

Specifically, the relevant part of the termination clause states:

> Your employment will continue until terminated by either party on one (1) month written notice, or if notice is given to you by us, the company will pay you one (1) month salary in lieu of you having to work any notice period. In that event payment would be made on or before you depart the company.

This language is unambiguous—plaintiff's employment could be terminated by either party by written notice. It is clear also that plaintiff could be terminated during the specified notice period, if OneMusic gave to plaintiff a severance check representing one-month's salary. Moreover, the undisputed facts show that OneMusic tendered to plaintiff a severance check representing one month's salary in the amount of $5,833.33 in accordance with the employment contract.[25]

In sum, plaintiff has failed to show that he should not be held responsible for the employment contract that he signed. Here, the record shows that the parties were negotiating at arms-length[26] and that plaintiff had an opportunity to consult with an attorney. Plaintiff's employment contract clearly enunciated the rights of the parties. Defendants' performance of the contract in accordance with its explicit

terms may not give rise to a breach of contract claim merely because plaintiff later determines that he is displeased with the agreement. *See White v. Larson,* 586 S.W.2d 212, 215 (Tex.Civ.App.1979, no writ) (holding that where defendant has contractual right to undertake contested action, defendants conduct is justified and no cause of action may arise from defendant's conduct).

Under *Lewis* and *White,* therefore, OneMusic's exercise of its contractual right to terminate plaintiff cannot constitute a breach of the employment contract. OneMusic exercised its right to terminate plaintiff in accordance with the terms of the contract; provided plaintiff with one-month's salary as obligated by the contract; and met all of the other terms of the agreement. Accordingly, defendant's compliance with the agreement and its rendering of the full amount of plaintiff's pay during the specified notice period, under *Hussong,* mandates that this Court find that OneMusic did not breach the employment contract. Consequently, defendant's motion for summary judgment is granted as to Count VII.

### b. The Gotham/OneMusic contract

Count VIII of the complaint alleges breach of the Gotham/OneMusic contract. As stated above, in Texas, the first prong in a contract analysis requires a determination as to whether a contract exists. Plaintiff fails to satisfy this preliminary threshold.

Plaintiff's allegation of a breach of the Gotham/OneMusic contract is based on

---

**24.** OneMusic never provided written notice to plaintiff.

**25.** In addition, the Texas Supreme Court has held that "parties to a contract have an obligation to protect themselves by reading what they sign." *Thigpen,* 363 S.W.2d at 253. Furthermore, " '[a] party in an arms-length transaction is charged with the obligation of reading what he signs and, ... cannot avoid the consequences of the instruments [that] he signs....' " *Penthouse,* 825 F.Supp. at 133

(quoting *Farina v. Calvary Hill Cemetery,* 566 S.W.2d 650, 652 (Tex.Civ.App.1978, writ ref'd n.r.e.)).

**26.** At one point, plaintiff attempted to have the termination clause changed from one-month notice to six-month's notice. The evidence shows further that defendants refused to agree to the six-month's notice provision, and that the one-month notice language remained in the termination clause.

plaintiff's contention that "OneMusic's agreement to employ plaintiff and its agreement to provide financial, marketing and distribution assistance to Gotham were a 'package deal.'" Pl.'s Br. at 13. Plaintiff argues further that Long admitted that the parties had reached an agreement in principle with respect to the Gotham deal, whereby OneMusic allegedly agreed to provide financing and assistance in the marketing and distribution of Gotham's library. Plaintiff states that he never received any of these items from defendant for Gotham.

The undisputed facts show clearly that Gotham and OneMusic participated in negotiations. Indeed, it was plaintiff who delayed finalization of the OneMusic/Gotham agreement. Plaintiff rejected defendants' original proposal of an agreement. Plaintiff's counsel sent to Long a four page letter requesting substantial revisions to the written draft agreement. OneMusic, however, ended the negotiations before agreeing to any of the proposed revisions.

Now plaintiff claims that the OneMusic/Gotham agreement is valid because "Long admitted that the parties had reached an agreement in principle." Pl.'s Br. at 13. Plaintiff, however, did not attach to his reply brief any evidence to support the veracity of his allegation regarding Long's admission.

In Texas, where a party fails to set forth any evidence to support his claim, the claim cannot survive summary judgment. *See Fisher v. State Farm Mutual Automobile Ins. Co.*, 999 F.Supp. 866, 872 (E.D.Tex.1998). In *Fisher*, the plaintiff sued alleging intentional infliction of emotional distress. The plaintiff argued that the defendant placed a memo containing false information in plaintiff's personnel file. The plaintiff, however, failed to attach the memo to his brief. The District Court held that "[s]ince no summary judg-

ment evidence was submitted to support this claim, [the claim] . . . cannot survive summary judgment." *Id.*

■ Finally, because a Gotham/OneMusic agreement was never executed, a Gotham/OneMusic contract never came into existence. A contract that did not exist, could not have been breached. *See Lewis v. Adams*, 979 S.W.2d 831, (Tex. App. 1998) (stating that where there is no contract, there can be no breach of contract claim).

This Court finds that there are no genuine issues as to any material facts that would preclude summary judgment regarding Count VIII. The undisputed facts show that there was no Gotham/OneMusic contract because Gotham and OneMusic never came to a meeting of the minds. Accordingly, defendants' motion for summary judgment is granted as to Count VIII.

### 4. *Tortious Interference*

In Counts XI and XII, plaintiff alleges that the "[t]he OneMusic defendants" [27] have tortiously interfered with plaintiff's continued employment at FirstCom, and that defendants have tortiously interfered with plaintiff's reasonable expectation of economic advantage regarding Gotham, respectively.

■ Under Texas law, the elements of a cause of action for tortious interference are: (1) a contract subject to interference; (2) the defendant's act of interference was willful and intentional; (3) the defendant's intentional act was a proximate cause of the plaintiff's damage; and (4) actual damage or loss occurred. *See 5636 Alpha Road v. NCNB Texas Nat'l Bank*, 879 F.Supp. 655, 662 (N.D.Tex.1995) (citing *Personal Preference Video, Inc. v. Home Box Office, Inc.*, 986 F.2d 110, 111 (5th Cir.1993)); *Southwestern Bell Tel. Co. v.*

---

**27.** Throughout his brief, plaintiff refers to the defendants in this case as the "OneMusic Defendants." Plaintiff explains that the OneMusic defendants are defendants Jim Long,

Honest Entertainment Group, OneMusic Corporation, Telos Holdings, Inc., Robert Jenkins, and Bob Jenkins Music Services.

*John Carlo Texas, Inc.,* 843 S.W.2d 470 (Tex.1992). Plaintiff has failed to make the requisite showings to support his tortious interference allegation.

There are no genuine issues as to any material facts presented regarding plaintiff's claim of tortious interference with his employment at FirstCom. It is undisputed that plaintiff was preparing to launch Gotham with Kallins *before* he began his negotiations and dealings with Long and Jenkins. Long Aff.Ex. 3; Lewin Dep. 36. In fact, it was *plaintiff* who approached Jenkins with a BJMS/Gotham proposed joint venture. Long Aff.Ex. 3; Lewin Dep. 38–39. Further, *plaintiff intended* to leave FirstCom and to pursue his Gotham business with his partner Kallin, *prior to* his dealings with OneMusic. Long Aff.Ex. 3; Lewin Dep. 131–32. Under those circumstances, plaintiff cannot claim to have been lured into a joint-venture deal with defendants.

■■■ This Court finds that the allegation that the defendants tortiously interfered with plaintiff's position at FirstCom is without merit. Accordingly, the defendants' motion for summary judgment is granted as to Count XI.

In addition, Plaintiff has failed to make any of the requisite showings regarding his claim that defendants tortiously interfered with plaintiff's prospective economic advantage regarding Gotham.

■■■ Plaintiff's claim fails on its face. First, it was *plaintiff who rejected* OneMusic's proposed written OneMusic/Gotham agreement. Plaintiff rejected the agreement; kept the agreement for two weeks; and proposed, through his attorney, extensive revisions to the agreement. These undisputed facts fail to establish the first element of the tortious interference claim—that a contract that has been interfered with. There are no genuine issues as to any material fact. Accordingly, defendants' motion for summary is judgment granted as to Count XII.

### 5. Estoppel

Count XIII of the complaint asserts an "estoppel" claim based upon OneMusic's "express and implied representations and promises" that:

(i) OneMusic would pay to plaintiff $75,000 annually or an average earned commission of 8%, whichever was greater;

(ii) Plaintiff would receive a significant ownership interest in OneMusic, including 1,000 shares of stock in OneMusic;

(iii) OneMusic would pay plaintiff's COBRA medical coverage; and

(iv) The OneMusic defendants would provide financial, marketing, and distribution assistance to Gotham.

In Texas, the elements of a promissory estoppel claim are:

■■■ (1) a false representation or concealment of material facts made with the intent that another party act on the false representation or silence; (2) the false representation or concealment of material facts was made by a party with knowledge of the facts; (3) the party to whom the representation was made or from whom facts were concealed was without knowledge or the means of knowledge of the real facts; and (4) detrimental reliance. *See Steubner Realty 19, Ltd. v. Cravens Road 88, Ltd.,* 817 S.W.2d 160, 163 (Tex.App. 1991, no writ).

■■■ Here, promises (i), (ii), and (iii) are all contained in the January 31, 1997, employment contract. Each of these first three terms is subject to the one-month termination clause. This Court previously determined that the termination clause in the employment contract was valid; hence, these terms cannot survive the one month termination provision. First, as noted above, there is no executed or enforceable OneMusic/Gotham agreement. Second, plaintiff presents no facts to support an assertion that defendants engaged in a false representation or concealment of material facts made with the intent that another party act on that false representa-

tion. Proof of this element of a promissory estoppel claim is a prerequisite to any consideration of plaintiff's claim. This failure of proof is ultimately insurmountable.

Plaintiff attempts to resuscitate his claim with a specious choice of law argument. Plaintiff contends that the estoppel claim should be analyzed under New Jersey law; however, plaintiff's brief points to both New Jersey and Texas law. As explained earlier, the contract expressly provides that Texas law shall govern in litigation; as such, this Court is bound to apply Texas law. *See supra* Choice of Law p. 13.

Plaintiff does not dispute that he was an at-will employee of OneMusic.[28] Under Texas law, an at-will employee may not reasonably rely on promises that were dependent on his or her continued employment. *See Robert J. Patterson, P.C. v. Leal,* 942 S.W.2d 692, 693 (Tex.App.1997, writ denied). In addition,

> [a] promise to provide employment which is subject to termination at any time or for any reason does not provide any assurances about the employer's future conduct, and does not provide a basis of detrimental reliance as a matter of law. Moreover, promissory estoppel may not be applied to recover reliance damages when there is a valid contract terminable at will.

**28.** Under established Texas law, employer-employee relationships default to an at-will status. *See City of Odessa v. Barton,* 967 S.W.2d 834, 835 (Tex.1998); *Federal Express Corp. v. Dutschmann,* 846 S.W.2d 282, 283 (Tex.1993); *Schroeder v. Texas Iron Works, Inc.,* 813 S.W.2d 483, 489 (Tex.1991); *Sabine Pilot Service, Inc. v. Hauck,* 687 S.W.2d 733, 734 (Tex.1985); *East Line & R.R.R. Co. v. Scott,* 72 Tex. 70, 10 S.W. 99, 102 (1888). The employment at-will rule allows either party to terminate the relationship at any time, with or without cause, with neither the employer nor the employee incurring liability. *See Travel Masters, Inc. v. Star Tours, Inc.,* 827 S.W.2d 830, 832–33 (Tex.1991) (citing *Martin v. Credit Protection Ass'n, Inc.,* 793

*Collins v. Allied Pharmacy Management, Inc.,* 871 S.W.2d 929, 937 (Tex.App.1994, no writ). To permit otherwise would "abrogate[ ] the employment at will doctrine in all cases where the employee must quit an existing job to accept a new offer of employment. . . . [I]t would be illogical to hold that an employee has no remedy if he fired one week after commencing work, but may recover damages if the employer refuses to allow him to commence work at all." *Id.*

Plaintiff argues that this case is not accord with *Roberts v. Geosource Drilling Servs. Inc.,* 757 S.W.2d 48 (Tex.App.1988). In *Roberts,* the court recognized an estoppel claim because the "employer foreseeably and intentionally *induce[d]* the prospective employee to materially change his position to his expense and detriment. . . ." *Id.* at 50 (emphasis added). *Roberts* is distinguishable on its face. Here, defendants did not *induce* plaintiff to resign his prior employment. To the contrary, in this case, the undisputed facts show that prior to his initial contact with defendants, plaintiff intended to create his own music library, Gotham, and intended that Gotham would eventually compete with First-Com. Finally, it was plaintiff who approached defendants with a joint venture proposal. Plaintiff has failed to show any inducement on the part of defendants.

Accordingly, as there are no genuine issues as to any material facts, the defen-

S.W.2d 667, 669 (Tex.1990)); *Schroeder,* 813 S.W.2d at 489. To depart from this settled default rule, an aggrieved employee bears "the burden of proving an express agreement or written representation . . . limit[ing] the employer's right to terminate the employee . . . with or without cause." *Massey v. Houston Baptist University,* 902 S.W.2d 81, 83 (Tex.App.1995, writ denied) (internal citations and quotations omitted). Plaintiff presented no proof of such an agreement. Therefore, this Court finds no restrictions, other than the one-month notice requirement, on either party's ability to terminate this relationship without cause, and, more importantly, without incurring liability.

dants' motion for summary judgment is granted as to Count XIII.[29]

## CONCLUSION

Defendants move for summary judgment on the following claims: Fraud, Breach of Contract, Intentional Interference with A Prospective Economic Advantage, and Estoppel. Based on this Court's analysis, defendants' motion is granted. There are no genuine issues as to any material facts. Applying the requisite standards to defendants' motion, summary judgment shall be granted on Counts III (Fraudulent Concealment), VII (Breach of the Employment Contract), VIII (Breach of the Gotham/OneMusic contract), XI (Intentional Interference with a Prospective Economic Advantage with FirstCom), XII (Intentional Interference with a Prospective Economic Advantage with Gotham), XIII (Estoppel), and XV (Piercing the Corporate Veil as to Long).

## ORDER

This matter having come before the Court on the motion for summary judgment of Defendants Jim Long, (incorrectly named in the Complaint as James Long), Honest Entertainment Group, OneMusic Corporation, Telos Holdings, Inc., and Robert Jenkins and Bob Jenkins Music Services (collectively the "Defendants") on Counts III, VII, VIII, XI, XII, XIII, and XV, of Plaintiff Claude Lewin ("Plaintiff"); and the Court having considered the submissions of the parties; and good cause appearing.

IT IS on this 19th day of November, 1999,

ORDERED that Defendants' motion for summary judgment, pursuant to Fed. R.Civ.P. 56(c) is GRANTED; and

IT IS FURTHER ORDERED that a copy of this Order be served on all parties within seven (7) days of the date of this Order.

---

**29.** The grant of summary judgment *in toto* mandates denial of plaintiff's request to hold Long individually liable, in that "the corporate veil may not be pierced absent a showing of actual fraud." *Menetti v. Chavers*, 974 S.W.2d 168, 174 (Tex.App.1998, no pet.); *Thrift v. Hubbard*, 44 F.3d 348, 353 (5th Cir. 1995) ("[I]n order to pierce the corporate veil, the obligee must also demonstrate fraud by and direct personal benefit to the obligor"); *see* Tex.Bus.Corp.Act Ann. Art. 2.21(A)(2) (Vernon Supp.1998) (amended by Act of May 1, 1997, ch. 373, § 7, 1997 Tex.Sess.Law Serv. 1522–3); 15 Tex.Jur.3d Corporations § 182 (West 1996); *see also* James G. Gaspard, II, *A Texas Guide to Piercing and Preserving the Corporate Veil,* 31 Bull.Bus.L.Sec. St.B.Tex. 24 (Sept.1994) (reconciling cases and legislation in concluding that veil may not be pierced absent proof of actual fraud in contractual actions, or proof of constructive fraud in tort claims). As summary judgment is granted to defendants on all counts, plaintiff's request, in Count XV of his Amended Complaint, to pierce the corporate veil as to Long is denied. Accordingly, Jim Long will not be held personally liable for any of plaintiff's allegations in this lawsuit.